*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0286a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

KAREN WAESCHLE, individually and on
behalf of others similarly situated,
                                        *Plaintiff-Appellee,*

        *v.*

LJUBISA J. DRAGOVIC, individually and in his
official capacity as Medical Examiner of
Oakland County, Michigan, and OAKLAND
COUNTY, MICHIGAN, a municipal
corporation,
                                        *Defendants-Appellants.*

No. 08-2228

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 08-10393—Victoria A. Roberts, District Judge.

Argued: June 16, 2009

Decided and Filed: August 14, 2009

Before: GILMAN and McKEAGUE, Circuit Judges; BARRETT, District Judge.[*]

_____

## COUNSEL

**ARGUED:** William H. Horton, GIARMARCO, MULLINS & HORTON, P.C., Troy,
Michigan, for Appellants. Patrick J. Perotti, DWORKEN BERNSTEIN CO., LPA,
Painesville, Ohio, for Appellee. Steven M. Jentzen, STEVEN M. JENTZEN, P.C.,
Ypsilanti, Michigan, for Amici Curiae. **ON BRIEF:** William H. Horton, Elizabeth A.
Favaro, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, Keith J.
Lerminiaux, OAKLAND COUNTY CORPORATION COUNSEL, Pontiac, Michigan,
for Appellants. Patrick J. Perotti, DWORKEN BERNSTEIN CO., LPA, Painesville,
Ohio, John Henry Metz, LAW OFFICE, Cincinnati, Ohio, for Appellee. Steven M.
Jentzen, STEVEN M. JENTZEN, P.C., Ypsilanti, Michigan, B. Eric Restuccia, OFFICE
OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, Daniel A. Ophoff,

_____

[*]The Honorable Michael R. Barrett, United States District Judge for the Southern District of Ohio,
sitting by designation.

KENT COUNTY, Grand Rapids, Michigan, Joanne G. Swanson, KERR, RUSSELL AND WEBER, PLC, Detroit, Michigan, for Amici Curiae.

––––––––––––––––––

**AMENDED OPINION**

––––––––––––––––––

RONALD LEE GILMAN, Circuit Judge.  After Karen Waeschle's mother died, an autopsy was performed to determine the cause of death.  When the mother's remains were returned to Waeschle for cremation, she was not informed that the brain had been removed during the autopsy and was still being studied by the Medical Examiner.  Waeschle sued Oakland County and Ljubisa J. Dragovic, the Oakland County Medical Examiner (Dragovic or the Medical Examiner), after discovering that her mother's brain had been incinerated as medical waste once the autopsy was completed.  The Medical Examiner, Waeschle maintains, violated the Due Process Clause of the Fourteenth Amendment by depriving her of the right to dispose of her mother's brain.

Oakland County and Dragovic filed for summary judgment, arguing that Waeschle had no constitutionally protected property right to possess her deceased mother's brain because it had been removed for forensic examination.  Dragovic also asserted a qualified-immunity defense.  In the alternative, the County and Dragovic requested that the district court certify to the Michigan Supreme Court the question of whether Michigan law gives Waeschle a property interest in her deceased mother's brain for the purpose of burial or cremation.

For the reasons set forth below, we **REVERSE** the portion of the district court's judgment denying Dragovic's qualified-immunity defense, and **REMAND** the case with instructions to grant his motion for summary judgment with respect to Waeschle's individual-capacity claim against him.  We also **REVERSE** the judgment of the district court denying Oakland County's and Dragovic's motion to certify the question of state law to the Michigan Supreme Court, and **REMAND** the case with instructions to certify the question and conduct such further proceedings as are necessary for the proper disposition of this case.

## I.  BACKGROUND

### A.    Factual background

Karen Waeschle's 88-year old mother, Katherine R. Weins, was a resident of a nursing home in West Bloomfield, Michigan.  In August 2006, she fell and hit her head.  Weins was taken to a hospital, where she died two weeks later.  Waeschle suspected that abuse or neglect caused the fall.  To investigate, the West Bloomfield Township Police Department requested that an autopsy be performed on Weins's body.  Waeschle did not challenge the request.

Dr. Ruben Ortiz-Reyes was the Deputy Oakland County Medical Examiner who conducted the autopsy.  This required Dr. Ortiz-Reyes to remove and examine various organs, including Weins's brain, for clues regarding the cause of her death.  To examine a brain, it must be soaked in a formaldehyde-like solution until it becomes stiff enough to dissect.  The soaking process normally takes 10 to 14 days.  With the exception of the brain, the other organs that Dr. Ortiz-Reyes examined were placed back into the body.

When Weins's body (minus the brain) was made available to Waschle, the latter cremated the remains.  Waeschle disposed of her mother's body without knowing that the brain was not included.  The Medical Examiner failed to notify Waeschle that her mother's body was being returned without the brain or that the Medical Examiner planned to incinerate it once the examination of that organ was completed.

Several months later, after disposing of her mother's body, Waeschle met with the Deputy Medical Examiner and was provided a copy of the autopsy report.  At that time, Waeschle learned that her mother's brain had been incinerated as medical waste without her consent.  This litigation followed.

### B.    Procedural background

As amended, Waeschle's complaint alleged that the Medical Examiner violated Waeschle's Fourteenth Amendment right to due process by not returning her mother's brain for disposal after the autopsy of that organ was completed.  Waeschle also claimed

that Dragovic negligently and intentionally inflicted emotional distress on her in violation of state law. In June 2008, the Medical Examiner filed a motion for summary judgment on the due process claim based upon the defense of qualified immunity. He also filed a motion to dismiss the state-law causes of action. In the alternative, Dragovic urged the district court to certify the state-law issues to the Michigan Supreme Court.

The district court dismissed the state-law claims. As for the due process claim, the court found that Waeschle had established that (1) she had a quasi-property interest in her mother's brain that was protected under the United States Constitution, and (2) the Medical Examiner deprived her of that interest while acting under color of state law. The court also found that Dragovic was not entitled to qualified immunity because the quasi-property interest was "clearly established" and because the Medical Examiner "reasonably should have known" that he was violating Waeschle's Fourteenth Amendment right.

## II.  ANALYSIS

### A.     Standard of review

This appeal involves the denial of a qualified-immunity claim, which was set forth in Dragovic's motion for summary judgment. "We review a district court's denial of qualified immunity de novo." *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

**B.     Section 1983 and the qualified-immunity framework**

Section 1983 serves as a vehicle to obtain damages caused by persons acting under color of state law whose conduct violates the U.S. Constitution or federal laws. *McQueen v. Beecher Comty. Schs.*, 433 F.3d 460, 463 (6th Cir. 2006). "A law enforcement officer's key defense to a § 1983 action is encapsulated in the concept of qualified immunity." *Drogosch v. Metcalf*, 557 F.3d 372, 377 (6th Cir. 2009). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (citation and internal quotation marks omitted).

Until recently, federal courts were required to conduct the qualified-immunity analysis using the two-step sequential inquiry set forth in *Saucier v. Katz*, 533 U.S. 194 (2001). The first step required courts to determine "whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right." *Pearson*, 129 S. Ct. at 816 (citations omitted). And

> if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

*Id*. (citation omitted).

In *Pearson*, however, the Supreme Court held that the sequential *Saucier* protocol was no longer mandatory. *Id.* at 818. The Court reasoned that

> [t]he procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case. There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.

*Id*.

Our qualified-immunity analysis that follows does not resolve the merits of Waeschle's constitutional claim. Doing so is unnecessary because, as will be shown, Waeschle's purported constitutional right is not clearly established.

**C.     Clearly established constitutional rights**

The "clearly established" prong of the two-step *Saucier* analysis is particularly important for the present case. This court has clarified that

> [f]or a right to be "clearly established," the contours of the right must be sufficiently clear that a reasonable official would understand that his or her conduct violates that right. The unlawfulness of the official or employee's conduct must be apparent in light of pre-existing law.

*Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir. 1996). "A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred." *Id*.

Waeschle complains that Dragovic violated her right to dispose of her mother's brain when he did not give her the opportunity to recover it for the purpose of burial or cremation. But whether Waeschle has this right under state law is far from clear. Before explaining why, we will set forth the framework governing the analysis of procedural due process claims to provide further context for the claim at stake in this appeal.

**1.     *Due process framework***

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "In order to establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2007) (citation omitted).

This appeal concerns the question of whether Waeschle has a constitutionally protected property interest under the first element listed above. "Property interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) (internal quotation marks omitted)).

Although property rights are principally created by state law, "whether a substantive interest created by the state rises to the level of a constitutionally protected property interest is a question of federal constitutional law." *Whaley v. County of Tuscola*, 58 F.3d 1111, 1114 (6th Cir. 1995). "Property interests protected by the due process clause must be more than abstract desires or attractions to a benefit. The due process clause only protects those interests to which one has a legitimate claim of entitlement." *Brotherton v. City of Cleveland*, 923 F.2d 477, 480 (6th Cir. 1991) (citations and internal quotation marks omitted). In the next subsection, we address the issue of whether Dragovic deprived Waeschle of a clearly established, constitutionally protected property right to her mother's brain without due process of law.

### *2.        White's claimed property right is not clearly established*

Waeschle cites two cases from this court in support of her claim that she has a clearly established property right to her mother's brain: *Brotherton v. Cleveland*, 923 F.2d 477 (6th Cir. 1991), and *Whaley v. County of Tuscola,* 58 F.3d 1111, 1117 (6th Cir. 1995). Each of these cases involves the removal of corneas from dead bodies without the authorization of the decedent's next of kin. Because the court in *Whaley* considered itself bound by *Brotherton*, we will discuss the cases in chronological order.

In *Brotherton*, the plaintiff's husband was discovered in his car without a pulse. He was taken to a hospital in Cincinnati, Ohio, where he was declared dead on arrival. The plaintiff declined to donate her husband's organs. Because the death might have been a suicide, the hospital transferred the body to the county coroner's office for an autopsy. After the autopsy was completed, the coroner permitted the removal of the decedent's corneas for storage in an eye bank. The hospital had failed to inform the

coroner that the plaintiff did not want her husband's body parts removed for donation. Nor did the coroner ask whether there were any such objections before allowing the removal of the corneas. In fact, an Ohio statute "permitted a coroner to remove the corneas of autopsy subjects without consent, provided that the coroner has no knowledge of an objection by the decedent, the decedent's spouse, or, if there is no spouse, the next of kin, the guardian, or the person authorized to dispose of the body." *Brotherton*, 923 F.2d at 478 (citing Ohio Rev. Code § 2108.60).

The plaintiff in *Brotherton* sued the county coroner under 42 U.S.C. § 1983, alleging that she was deprived of her property rights in violation of the Due Process Clause because her husband's corneas had been removed without her consent. *Id*. at 478-79. Although the district court dismissed the complaint for failing to state a claim, this court reversed, holding that "the aggregate of rights granted by the state of Ohio to [the plaintiff] rises to the level of a legitimate claim of entitlement in [the decedent's] body, including his corneas, protected by the due process clause of the fourteenth amendment." *Id.* at 482 (internal quotation marks omitted).

In reaching this conclusion, the *Brotherton* court impliedly conceded that the widow's rights to her husband's dead body were quite limited. The court acknowledged, for example, that Ohio courts had expressly declined to recognize that the next of kin have vested property rights in the bodies of their deceased relatives. *Id*. at 480 (citing *Carney v. Knollwood Cemetery Ass'n*, 514 N.E.2d 430, 434-35 (Ohio Ct. App. 1986)). On the other hand, the court noted that "property" is traditionally conceptualized as a bundle of rights, including "the rights to possess, to use, to exclude, to profit, and to dispose." *Id.* at 481. Moreover, there was little doubt that Ohio law afforded the next of kin at least some of these rights with respect to their relative's body. *See id.*

The court in *Brotherton* emphasized that the plaintiff had the right under Ohio law to possess her husband's body for the limited purpose of conducting a burial or other lawful disposition. *Id*. at 482. Another right of the next of kin is to make an anatomical gift of their relatives' organs. *See id.* at 478 ("The hospital asked [the plaintiff] to consider making an anatomical gift; she declined . . . ."). *Brotherton* concluded that

these limited rights, even though they were not labeled property rights by the Ohio courts, formed the basis of a constitutionally protected property interest in the decedent's body, including the corneas. *Id.*

*Whaley* involved similar facts. Two Michigan counties hired a pathologist to conduct autopsies on a contractual basis. The counties entered into an agreement pursuant to which the pathologist's assistant was allowed to remove a decedent's corneas without the consent of the next of kin. In return, the pathologist's assistant, who stood to profit from selling the corneas, agreed to bear "all the counties' expenses in performing the autopsies whenever corneas were removed, and half those expenses when they were not." *Whaley*, 58 F.3d at 1113.

Once this cornea-removal practice was discovered, a class of plaintiffs sued the counties, alleging that "they were deprived of their Fourteenth Amendment right to procedural due process when the alleged state actors removed the decedents' eyeballs or corneas." *Id.* The district court dismissed their complaint after concluding that Michigan law did not create rights that qualified as constitutionally protected property interests under the Due Process Clause. *Id.*

Just as in *Brotherton*, however, this court reversed the district court's judgment, holding that "the next-of-kin [have] a legitimate claim of entitlement and thus a property interest in a dead relative's body, including the eyes." *Id.* at 1117. The court reasoned that it was bound by *Brotherton* because Michigan law contained "the same basic rights in a deceased person's body as Ohio." *Id.* at 1114. One such right is that of the next of kin "to possess the body for burial and prevent its mutilation." *Id.* This right was inferred from several Michigan Supreme Court cases recognizing a cause of action for the unlawful mutilation of a corpse. *See id.* (citing, for example, *Deeg v. City of Detroit*, 76 N.W.2d 16, 19 (Mich. 1956) ("It seems to be settled by the great weight of authority that the unlawful and intentional mutilation of a dead body gives rise to a cause of action on behalf of the person or persons entitled to the possession, control, and burial of such body.")) The next of kin also have the right to choose whether to make "a gift of all or

part of the decedent's body, at least when there is no contrary intent evidenced by the decedent." *Whaley*, 58 F.3d at 1116. In sum, the court concluded that

> the next of kin have the right to dispose of the body in limited circumstances, possess the body for burial, and prevent its mutilation. Applying *Brotherton*, we therefore hold that Michigan provides the next of kin with a constitutionally protected property interest in the dead body of a relative.

*Id*.

Waeschle contends that the same basic reasoning found in *Brotherton* and *Whaley* controls this appeal. Her argument is, in essence, that her mother's brain is no less constitutionally protected than are eyes or corneas. She also contends that the cornea cases serve to satisfy the second prong of *Saucier*'s qualified-immunity analysis because they allegedly demonstrate that the right to her mother's brain was clearly established.

*Brotherton* and *Whaley*, however, are distinguishable from the present case. The key difference is that the brain of Waeschle's mother was removed and retained for study by the Medical Examiner in furtherance of a lawful criminal investigation. By contrast, the removal of corneas in *Brotherton* and *Whaley* served no investigative function whatsoever. The distinction is important because Waeschle might have no right under Michigan law to possess, control, or dispose of her mother's brain once it is removed for legitimate forensic study.

A pair of cases decided in the Southern District of Ohio on this very issue illustrate the conflicting viewpoints. The first case, *Hainey v. Parrott*, No. 1:02-CV-733, 2005 WL 2397704, at *4-5 (S.D. Ohio Sept. 28, 2005), supports Waeschle's position. In *Hainey*, the plaintiffs brought a class-action lawsuit after learning, as Waeschle did, that they had buried their loved ones' bodies without the brains because the latter had been removed during autopsy and retained for further study. The Ohio coroner moved for, and the district court denied, summary judgment on the basis of qualified immunity.

According to the district court in *Hainey*, the plaintiffs had a legitimate claim of entitlement to the decedents' brains in light of *Brotherton*. *Brotherton*'s holding, the court continued, broadly included "the right to take possession of what remains of the deceased's body following the completion of the autopsy." *Hainey*, 2005 WL 2397704, at *6. The court further concluded that "*Brotherton* very broadly and very clearly held that family members have a property interest in their decedent's body parts which is protected by the due process clause of the Fourteenth Amendment." *Id.* at *8. This purportedly clear ruling, furthermore, rendered the coroner ineligible for qualified immunity because "a reasonable coroner in this judicial circuit would have known that disposing of body parts without notice to the decedent's next of kin would have violated that right." *Id.*

*Hainey* therefore supports Waeschle's claim. But subsequent caselaw in Ohio reaches the opposite conclusion. The same district court, in *Albrecht v. Treon*, No. 1:06-cv-274, 2007 WL 777864, at *1 (S.D. Ohio March 12, 2007) (*Albrecht I*), considered a virtually identical fact pattern as the one addressed in *Hainey*. A lawsuit was filed against the coroner of Clermont County, Ohio after the plaintiffs discovered that the coroner "had removed their son's brain for forensic examination and retained it after the autopsy." *Albrecht I*, 2007 WL 777864, at *1. In response, the coroner argued that the court in *Hainey* had misinterpreted applicable Ohio law. *Id.* The coroner requested that the district court certify the following question to the Ohio Supreme Court:

> Whether the next of kin of a decedent, upon whom an autopsy has been performed, have a property right under Ohio law in the decedent's tissues, organs, blood or other body parts that have been removed and retained by the coroner for forensic examination and testing.

*Id*. at *2.

Acknowledging that Ohio law affords the next of kin a custodial right in the body of the decedent, the district court nevertheless concluded that the right does not "automatically confer to the next of kin a protected right in 'body parts' of a decedent removed and retained by the coroner for forensic examination and testing." *Id.* at *5. The court emphasized that an Ohio statute appeared to severely restrict the rights of the

next of kin to body parts or tissues collected during the course of an autopsy.  *Id.* (citing Ohio Rev. Code § 313.123(B)(1) (2006) , which provides that "retained tissues, organs, blood, other bodily fluids, gases, or any other specimens from an autopsy are medical waste and shall be disposed of in accordance with applicable federal and state laws").

Indeed, there was only one exception to this medical-waste disposal requirement, triggered by religious considerations.  *Id.* (citing Ohio Rev. Code § 313.123(B)(2), which states that the coroner must return specimens to the person who has the right to the disposition of the body if "the coroner has reason to believe that the autopsy is contrary to the deceased person's religious beliefs.").  Despite this statute's provision stating that autopsy specimens are to be treated as medical waste, the district court granted the coroner's request to certify the issue to the Ohio Supreme Court after concluding that none of the existing Ohio authorities resolved the precise issue of whether the next of kin had a right to dispose of body parts that had been collected during an autopsy.  *Albrecht I*, 2007 WL 777864, at *5–6.

The Ohio Supreme Court accepted the certified question for review and repudiated the plaintiffs' position, holding that "the next of kin of a decedent upon whom an autopsy has been performed *do not have a protected right under Ohio law in the decedent's tissues, organs, blood, or other body parts that have been removed and retained by the coroner for forensic examination and testing.*"  *Albrecht v. Treon*, 889 N.E.2d 120, 122 (Ohio 2008) (*Albrecht II*) (emphasis added).  In reaching this conclusion, the court distinguished *Brotherton*, reasoning that "*Brotherton*'s specific holding regarding removal of corneas for purposes unrelated to the autopsy is not relevant in this case."  *Id*. at 124.  The corneas in *Brotherton* were extracted pursuant to an Ohio statute that permitted their removal even when doing so was not necessary to conduct a forensic examination.  923 F.2d at 478-79.  Different interests are at stake, according to the Ohio Supreme Court, when tissue is taken for lawful investigative purposes:

> [A] deceased's next of kin *had no protected right in autopsy specimens pursuant to Ohio statutes*.  The Ohio Revised Code authorizes coroners to perform an autopsy when the coroner believes an autopsy is necessary.

> A coroner's forensic examination is a classic function of the police power of the state. Many times, autopsy specimens and the results of the forensic examination are essential evidence in the prosecution of a crime. Sometimes, autopsy specimens must be preserved for long periods of time.

*Albrecht II*, 889 N.E.2d at 126-27 (citation omitted) (emphasis added).

Furthermore, the Ohio Supreme Court noted that its conclusion did not depend on the existence of the 2006 statute that designated autopsy specimens as medical waste. *Id.* at 126 (holding that "[e]ven before [Ohio Rev. Code § 313.123(B)] was enacted, a deceased's next of kin had no protected right in autopsy specimens pursuant to Ohio statutes"). *Albrecht II* clearly raises a question as to the scope of the quasi-property right at issue in both *Brotherton* and *Whaley* where forensic specimens are collected in the course of criminal investigations (as in the present case).

Waeschle's property rights, of course, are not defined by Ohio law. But *Whaley* observed that Michigan law contained "the same basic rights in a deceased person's body as Ohio." *Whaley*, 58 F.3d at 1115. The Ohio Supreme Court's decision in *Albrecht II* is therefore relevant in assessing whether the same right is clearly established under Michigan law. And the Court's decision in *Albrecht II*, which explicitly denied that the next of kin have a right to body parts collected for forensic examination, suggests that such a right would probably not be recognized under existing Michigan law.

But our analysis is not based exclusively on the analogy to cases construing Ohio law. Instead, our independent review of Michigan law fails to establish an unequivocal post-autopsy right to specimens taken for the purpose of a lawful criminal investigation. One of the cases from the Michigan Supreme Court cited by Waeschle recognizes a cause of action for the unlawful and intentional mutilation of dead bodies. *Deeg v. City of Detroit*, 76 N.W.2d 16, 19 (Mich. 1956) ("It seems to be settled by the great weight of authority that the unlawful and intentional mutilation of a dead body gives rise to a cause of action on behalf of the person or persons entitled to the possession, control, and burial of such body."). Another recognizes the next of kin's right to control a relative's

body for the limited purpose of securing a burial.  *Doxtator v. Chicago & W.M. Ry. Co.*, 79 N.W. 922, 922 (Mich. 1899) (recognizing that, although there was "no property in a dead body [at common law], . . . the one whose duty it is to care for the body of the deceased is entitled to possession of the body, as it is when death comes, and that it is an actionable wrong for another to interfere with that right by withholding the body or mutilating it in any way").

But these cases, as well as others cited by Waeschle, fail to address the question of body parts retained for forensic examination.  *See Keyes v. Konkel*,78 N.W. 649, 649 (Mich. 1899) (observing that various state courts have considered dead bodies to be "quasi property," and recognizing a tort for infringing on a next of kin's right to have an unmutilated dead body delivered for burial); *Dampier v. Grace Hosp. Corp.*, 592 N.W.2d 809 (Mich. Ct. App. 1999) (addressing causes of action available against coroners who allowed the decomposition of a dead body in their possession); *Tillman v. Detroit Receiving Hosp.*, 360 N.W.2d 275, 277 (Mich. Ct. App. 1984) ("While there is no property right in the next of kin to a dead body, . . . Michigan jurisprudence recognizes a common law cause of action on behalf of the person or persons entitled to the possession, control, or burial of a dead body . . . .").  None of these cases consider the situation where body parts were removed and retained during an autopsy for study in the course of a properly authorized criminal investigation.

Nor does Waeschle identify any Michigan statute that unambiguously sets forth a Medical Examiner's duties regarding how he or she should dispose of particular body parts collected for the purposes of an autopsy.  One statute authorizes Medical Examiners to retain, "as long as may be necessary, any portion of the body believed by the medical examiner to be necessary for the detection of any crime."  Mich. Comp. Laws § 52.205 (emphasis added).  The same statute instructs Medical Examiners to "promptly deliver or return *the body* to relatives or representatives of the deceased."  *Id*. (emphasis added).  Another statute cited by Waeschle simply describes the right of the next of kin to make decisions regarding, for example, funeral arrangements.  *See id*. § 700.3206(1).

Waeschle argues that the above provisions create the right to a prompt return of her mother's brain after the Medical Examiner had completed the autopsy. But the statutory language does not specify whether each and every body part or specimen collected during the course of an autopsy must be returned to the next of kin on a piecemeal basis. Such a requirement might prove totally impracticable.

In sum, Michigan law regarding the rights of the next of kin in their relative's body parts removed for forensic examination during an autopsy is at best equivocal. Not a single case instructed Dragovic to treat the brain in any manner other than the way he did. Nor did any Michigan statute unambiguously instruct Dragovic on how to dispose of individual body parts retained for forensic examination as opposed to dealing with the body as a whole.

Waeschle's alleged constitutionally protected property right to her mother's brain is therefore not clearly established because the underlying state-created property interest is not "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See Drogosch v. Metcalf*, 557 F.3d 372, 379 (6th Cir. 2009) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). For that reason, Dragovic is entitled to summary judgment on the basis of qualified immunity. *See Drogosch*, 557 F.3d at 379.

To avoid any misunderstanding, we wish to clarify the limits of this holding. There is nothing in the preceding analysis that is intended to suggest that Michigan law clearly establishes that the next of kin have *no* quasi-property interest in body parts collected during the course of an autopsy for forensic examination. Nor is the discussion meant to foreclose the possibility that, if Michigan establishes such a right in the future, the interest would rise to the level of a constitutionally protected property right under the Fourteenth Amendment. In light of *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009), however, we are under no obligation to determine the existence or the scope of Waeschle's right to her mother's brain in the present case.

We also wish to acknowledge that Waeschle's shock in learning that her mother's brain was incinerated as medical waste is understandable. And the possibility

exists that Michigan might in the future decide to recognize a right to recover organs that were originally retained as part of a lawful criminal investigation. Such a right would also presumably have to distinguish between major body parts (to which individuals like Waeschle would have a right to possess for the purpose of burial or cremation) and insignificant tissue samples (to which no such right would attach). But Michigan law as presently developed does not clearly recognize that such a custodial right to body parts exists. And whether to recognize such a right is a task that the Michigan legislature and courts are better equipped to handle than this court, which is why we are exercising our discretion under *Pearson* to not further explore the first prong of the qualified-immunity test as set forth in *Saucier v. Katz*, 533 U.S. 194 (2001).

**D.      Oakland County and official-capacity claim**

Although the preceding qualified-immunity analysis shields Dragovic from Waeschle's individual-capacity claim, we have declined to evaluate the merits of Waeschle's due process claim because we are uncertain as to whether Michigan law gives Waeschle a property interest in her deceased mother's brain that is constitutionally protected. Waeschle's due process claim against Dragovic in his official capacity and against Oakland County is therefore still pending.

We have already explained that the merits of Waeschle's constitutional claim depend primarily on whether, under Michigan law, she had a property interest in her deceased mother's brain. *See Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2007) (explaining that the question of whether a constitutionally protected property interest exists is often a question of state law). Specifically, Waeschle's due process claim turns on the answer to the following state-law question:

> Assuming that a decedent's brain has been removed by a medical examiner in order to conduct a lawful investigation into the decedent's cause of death, do the decedent's next-of-kin have a right under Michigan law to possess the brain in order to properly bury or cremate the same after the brain is no longer needed for forensic examination?

Given our view that the Michigan courts are better suited to answer the unsettled state-law aspect of Waeschle's due process claim than we are, we will exercise our

discretion to have the district court certify the above-stated issue to the Michigan Supreme Court. *See Transamerica Ins. Co. v. Duro Bag Mfg. Co.*, 50 F.3d 370, 372 (6th Cir. 1995) (explaining that certification to a state's highest court is proper "when the question is new and state law is unsettled") (citations omitted); *Geib v. Amoco Oil Co.*, 29 F.3d 1050, 1060 (6th Cir. 1994) (observing that certification is appropriate "where an important question of state law has arisen solely in federal court"); Mich. Ct. R. § 7.305(B)(1) (permitting the Michigan Supreme Court to address questions of Michigan law that have been certified by a federal court).

### III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the portion of the district court's judgment denying Dragovic's qualified-immunity defense, and **REMAND** the case with instructions to grant his motion for summary judgment with respect to Waeschle's individual-capacity claim against him.  We also **REVERSE** the judgment of the district court denying Oakland County's and Dragovic's motion to certify the question of state law to the Michigan Supreme Court, and **REMAND** the case with instructions to certify the question and conduct such further proceedings as are necessary for the proper disposition of this case.